471 F.2d 320
 UNITED STATES of America, Plaintiff-Appellant-Cross Appellee,
v.
2,997.06 ACRES OF LAND, MORE OR LESS, Situate IN MARION
COUNTY, STATE of FLORIDA et al., Defendants-Appellees, and
Ocala Manufacturing, Ice and Packing Company et al.,
Defendants-Appellees-Cross Appellants.
UNITED STATES of America, Plaintiff,
v.
2,997.06 ACRES OF LAND, MORE OR LESS, Situate IN MARION
COUNTY, STATE OF FLORIDA et al., Defendants, and
Ocala Manufacturing, Ice and Packing
Company et al.,
Defendants-
Appellants-
Cross Appellees,
Canal Authority of the State of Florida,
Defendant-Appellee-Cross-Appellant.
 Nos. 71-2349, 71-2678.
 United States Court of Appeals,
Fifth Circuit.
 Dec. 18, 1972.
Rehearing Denied Jan. 24, 1973.
 
 R. Lee Smith, C. Ray Greene, Jr., Jacksonville, Fla., for Ocala.
 Ralph E. Elliott, Jr., Allan P. Clark, Jacksonville, Fla., for Canal Authority of Fla.
 George R. Hyde, Appellate Div., Division of Lands and Natural Resources, U. S. Dept. of Justice, Washington, D. C., for interested party.
 John L. Briggs, U. S. Atty., Jacksonville, Fla., Charles F. MacMullan, Dept. of Justice, Washington, D. C., John D. Roberts, Asst. U. S. Atty., Jacksonville, Fla., George R. Hyde, Appellate Div., Division of Lands and Natural Resources, U. S. Dept. of Justice, Shiro Kashiwa, Asst. Atty. Gen., Edmund B. Clark, Atty., Dept. of Justice, Washington, D. C., for the United States.
 Before JOHN R. BROWN, Chief Judge, and BELL and SIMPSON, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 The Canal Authority of the State of Florida (Canal Authority) brought eminent domain proceedings in a state court to condemn the fee simple title to approximately 3,500 acres of land in Marion County, Florida, owned by the Ocala Manufacturing Ice and Packing Company (Ocala Manufacturing), for the construction of the Cross-Florida Barge Canal. The state trial judge refused to approve the condemnation of the fee title to all but approximately 500 acres of the property involved. No appeal was taken from that ruling by the Canal Authority. As a proximate result of the Canal Authority's failure to pursue its state appellate remedies, this Court is faced with multiple appeals from a federal condemnation judgment. Complex and novel questions of law are presented. We are persuaded that we should reverse the judgment of the district court and remand for entry below of judgment for Ocala Manufacturing.THE CANAL AUTHORITY OF THE STATE OF FLORIDA
 
 
 2
 The Canal Authority is a corporate entity which operates under the supervision of the Department of Natural Resources of the State of Florida. Florida Statutes, Sec. 374.011, F.S.A.[1] It is authorized by Sec. 374.051(1) (a)[2] to construct a canal across the peninsula of Florida and by Sec. 374.071[3] to exercise the power of eminent domain to accomplish its objectives. Federal participation in the construction of the canal is contemplated by Sec. 374.171.[4]
 
 
 3
 THE ROLE OF THE FEDERAL GOVERNMENT IN THE CANAL PROJECT
 
 
 4
 The Canal Authority was created by the Florida Legislature in 1933. Nine years later, on June 15, 1942, the Chief of Engineers, United States Army, wrote the Chairman of the Committee on Rivers and Harbors, House of Representatives, regarding the participation of the United States Government in the construction of the Cross-Florida Barge Canal.[5] On July 23, 1942, Public Law 77-675, 56 Stat. 703, authorizing the construction of a barge canal across the State of Florida, was approved.[6]
 
 
 5
 Subsequently, the Canal Authority and the Corps of Engineers, United States Army, entered into contractual arrangements for the sharing of costs in the construction of the Cross-Florida Barge Canal. These arrangements were ratified by Congress in Section 104 of Public Law 86-645, July 14, 1960, 74 Stat. 480, 484-5.[7]
 
 
 6
 On January 15, 1971, the United States District Court for the District of Columbia granted the motion of the Environmental Defense Fund, Inc., for a preliminary injunction against further construction work on the canal project. Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army, D.D.C., 1971, 324 F.Supp. 878. Before an injunctive order was entered, the President of the United States, on January 19, 1971, ordered the suspension of further work on the canal. The text of the President's statement is printed in the margin.[8] The validity of the order suspending further construction of the canal has since been placed in issue by means of several lawsuits now pending in the United States District Court for the Middle District of Florida. See, In re Cross-Florida Barge Canal Litigation, Jud. Pan.Mult.Lit., 1971, 329 F.Supp. 543.
 
 THE STATE COURT CONDEMNATION PROCEEDING
 
 7
 On March 18, 1969, the Canal Authority instituted action No. 69-203 in the Florida Circuit Court for Marion County, Florida. That suit sought the condemnation of fee simple title to the following adjoining parcels of land owned by Ocala Manufacturing:
 
 Parcel #1 (Eureka Pool): 2,925.68 acres
 Parcel #2 (Dosh Lock Site): 259.40 acres
 
 8
 Parcels #3 and #4 (spoil areas): 21.40 acres
 
 Parcel #5 (canal prism): 212.60 acres
 
 9
 Ocala Manufacturing resisted this condemnation proceeding. On May 16, 1969, the state trial judge, Judge Booth, approved the taking of Parcel #2 and Parcel #5 in fee simple and granted perpetual easements to the Canal Authority with respect to Parcels #1, #3 and #4. These rulings were supported by the following findings:
 
 
 10
 "4. That the evidence presented affirmatively shows that the lands designated as Parcel No. 1 will not be altered in any way by the construction, operation, repair, or improvement of the Cross-Florida Barge Canal, its embankments, locks and appurtenances except to flood said lands because of the construction of Eureka Dam approximately twenty (20) miles north of said property and that said lands will only be used as a water storage area which does not require the owner being deprived of the fee simple title to said lands, but only requires the right by the petitioner to flood said lands, control erosion, control the input and withdrawal of water and mosquito control.
 
 
 11
 "5. That the evidence presented affirmatively shows that the lands designated as Parcel No. 3 and Parcel No. 4 are necessary for construction spoil areas for the Cross-Florida Barge Canal for an indefinite period of time and does not require the owner being deprived of the fee simple title to said lands, but only requires the perpetual right by the petitioner to use said lands as a spoil area.
 
 
 12
 "7. That the evidence presented affirmatively shows that a majority of the members of the Canal Authority of the State of Florida which adopted the Resolution of Necessity for fee simple title upon which this suit is founded were not informed that the United States Army Corps of Engineers only required an easement in certain of the lands covered by the Resolution and knew of no reason why an easement would not be sufficient for the lands required in the pool or reservoir area.
 
 
 13
 "8. That the evidence presented affirmatively shows that a majority of the members of the Canal Authority of the State of Florida which adopted the Resolution of Necessity for fee simple title upon which this suit is founded, and the Managing Director of the Canal Authority of the State of Florida, and the Chief of the Design Division of the United States Army Corps of Engineers, knew of no plans for a future use of the fee simple title other than the present needs which can be satisfied by an easement as to Parcel No. 1.
 
 
 14
 "9. That the Canal Authority of the State of Florida exceeded the authority granted to it by Chapter 374.071, based upon the evidence presented to this Court and grossly abused its discretion in determining to acquire by condemnation the fee simple title rather than the easements necessary for the construction, operation, repair, or improvement of the Cross-Florida Barge Canal as said Resolution pertains to Parcel No. 1, Parcel No. 3 and Parcel No. 4."
 
 
 15
 Following this ruling, the Corps of Engineers advised the Canal Authority that a perpetual flooding easement as to Parcel No. 1 would not suffice for the intended use of those lands. Accordingly, the Canal Authority elected not to appeal from Judge's Booth's decision as to Parcel No. 1 and dismissed the lands known as Parcel No. 1 from the condemnation proceeding.
 
 
 16
 On October 13, 1969, trial before a jury was had in the state court on the question of the proper valuation of the approximately 500 acres, (Parcels #2, #3, #4 and #5) interests in which the Canal Authority was seeking to condemn. Ocala Manufacturing presented expert testimony of two appraisers assessing respectively $1,607,811.00 and $1,517,000.00 as its total damages flowing from the taking of interests in the 500 acres. With respect to the value of the fee simple title to Parcels #2 and #5, the landowner presented high testimony in the amount of $163,691.00.
 
 
 17
 Chapter 73 of the Florida Statutes deals with eminent domain proceedings. Section 73.071[9] directs that in eminent domain proceedings all damages including the value of the interests taken and damages to untaken portions, be tried and fixed in the condemnation proceeding. Accordingly, the state trial judge accurately instructed the jury in pertinent part, as follows:
 
 
 18
 "The controlling law governing the appropriation of the property of another for purposes by the state, its agencies and political subdivisions, is found in Article Ten, Section Four of the Constitution of the State of Florida which reads: 'No private property shall be taken except for public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the Court and available to them.'
 
 
 19
 "This Court has already determined in these proceedings that the Petitioner is entitled to condemn the private property involved in this cause for public use, and, therefore, the sole question to be determined by you is the amount of money to be paid to the Defendant as just and full compensation. Neither the propriety of the taking nor the location of the facility is a matter to be considered by you, nor should the matter of the Defendant's cost and expenses, including their attorney's fees, enter into your deliberations. The Petitioner is required to pay these costs, expenses and attorney's fees, the amount being established in a separate proceeding before this Court. Since the power of Eminent Domain is necessary for the public good, it would be unjust to the public if the Petitioners would be required to pay the owner more than a fair compensation for the loss that he sustained by the appropriation of his property for the general good. On the other hand, the owner, being compelled by law to part with his property whether he desires to sell or not, it would be unjust to the owner to require him to accept less than fair compensation therefor.
 
 
 20
 "You are instructed that the controlling date to use in the determination of the value of the property sought to be taken in this cause is July 7, 1969.
 
 
 21
 "You are further instructed that for the purpose of this trial you will consider the Sharpes Ferry Road closed at the Bert Dosh Lock Site.
 
 
 22
 "You are instructed that in determining the question of the amount of compensation which should be awarded to the Defendant, you should take into consideration, one: the value of the land and improvements actually taken from the Defendant; two: the damage, if any, to the Defendant's adjacent remaining land which is caused by the taking.
 
 
 23
 "In determining the full compensation to be paid for the land taken and the damage to the remaining lands, if any, you must find the fair market value of the subject property. The fair market value of the property may be deemed that sum which, considering all the circumstances, would be arrived at by fair negotiation between an owner willing to sell and a purchaser willing to buy, neither being under any pressure.
 
 
 24
 "In making that determination, there should be taken into consideration all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining. You should take into account, one: the use to which the subject property was or might be applied. The value of the property to the Petitioner for its particular use is not the sole test for determining its market value. You should not consider speculative or fanciful values or uses of the property. Prospective uses of the property, even though reasonable, should be considered only insofar as they affect the market value of the property as of the date of evaluation. Two: you should also consider the present general market value of other like properties in the same locality as the property in question.
 
 
 25
 "In conclusion, the Defendant must be compensated for what is taken from him and that is done when he is paid fair compensation therefor. The test for determining the fair compensation for the property taken by the condemnation proceedings is not: What has the taker gained; but what has the owner lost.
 
 
 26
 "In arriving at your verdict, you are instructed that your verdict shall not be less than the lowest value testified to by any witness, nor shall it be higher than the highest value testified to by any witness." (Emphasis added.)
 
 
 27
 The jury returned a verdict for Ocala Manufacturing in the sum of $575,292.00. No break-out of the elements which went into the computation of this award was provided by the jury.[10] Seeking to clarify its rights under the jury's verdict, the Canal Authority submitted a proposed judgment to the state court which contained a provision awarding the Canal Authority the right to flood the lands designated as Parcel #1. On November 10, 1969, the state court entered judgment in the amount fixed by the jury, thereby vesting in the Canal Authority fee simple title with respect to Parcels #2 and #5 and perpetual easements as to Parcels #3 and #4. The judgment was silent as to the Canal Authority's right to flood the lands in Parcel #1. It became final on December 10, 1969 with the expiration of the time for appeal under Florida Appellate Rule 3.2, subd. b, 32 F.S.A. (effective October 1, 1968).
 
 THE FEDERAL CONDEMNATION PROCEEDING
 
 28
 Following the dismissal of its condemnation proceeding in the state court with respect to the lands in Parcel #1, the Canal Authority asked the Corps of Engineers, United States Army, to acquire, by means of a federal eminent domain suit, the Eureka Pool property. It was understood that the Canal Authority would reimburse the United States for the cost of the condemned lands.
 
 
 29
 The United States of America, on October 3, 1969, instituted action No. 69-26-Civ-Oc in the Ocala Division of the United States District Court for the Middle District of Florida. This action was brought pursuant to the Acts of Congress authorizing federal participation in the Cross-Florida Barge Canal undertaking, supra, and the following statutes: Title 33, United States Code, Section 592;[11] Title 22, United States Code, Section 593;[12] Title 33, United States Code, Section 701;[13] Title 33, United States Code, Section 701c-2;[14] and Title 40, United States Code, Section 258a.[15]
 
 
 30
 Two parcels of land were sought to be taken in No. 69-26-Civ-Oc: (1) Tract 1201, consisting of 2,992.58 acres, an area roughly equivalent to the lands described as Parcel #1 in the state eminent domain proceeding plus some additional acreage; and (2) Tract 1300A, consisting of 4.48 acres. On September 11, 1970, the Canal Authority, claiming an interest in Tract 1201 by virtue of the judgment in the state condemnation proceeding, entered its appearance in the federal action. Six days later, on September 17, 1970, the United States amended its condemnation complaint by naming the Canal Authority as a party claiming an interest in the property described in the complaint.
 
 
 31
 The district judge issued a pre-trial order on September 17, 1970. That order directed that the issue to be determined at the upcoming jury trial would be the just compensation for the estate as set forth in the complaint in condemnation as of October 9, 1969. It further directed that the distribution of the just compensation determined by means of the jury trial would be litigated in a non-jury, post-judgment proceeding in which the Canal Authority and the Southwest Florida Water Management District would be permitted to participate.
 
 
 32
 On November 13, 1970, the federal jury found the sum of $1,093,316.50 to be just compensation for the taking of Tract 1201 and on November 25, 1970, the district judge rendered judgment against the United States, and in favor of all parties having compensable interests in Tract 1201, in the amount of the jury verdict.
 
 
 33
 The United States moved for a new trial asserting that numerous errors had been committed during the course of the jury trial and attacking the verdict of the jury as excessive and without a basis in the evidence.
 
 
 34
 Ocala Manufacturing, on December 17, 1970, moved for an order of partial distribution in the amount of $375,000.00. That motion was granted by the district court on December 21, 1970.
 
 
 35
 Following a non-jury apportionment trial, the district judge, on January 21, 1971, rendered his decision apportioning the just compensation award returned by the jury on November 13, 1970. He found that, as of October 8, 1969, the Canal Authority possessed a compensable interest consisting of the right to flood 2,100 acres of the lands designated as Tract 1201. He then awarded the sum of $850,000.00 to Ocala Manufacturing and the sum of $243,316.50 to the Canal Authority for their respective interests in the Tract 1201 lands. On the same date, January 21, 1971, the district judge by separate order denied the motion of the United States for new trial.
 
 
 36
 Ocala Manufacturing, on January 29, 1971, moved for new trial as to the non-jury apportionment proceeding. Citing the President's suspension directive of January 19, 1971, Ocala Manufacturing, on March 10, 1971, moved to set aside the final judgment and the declaration of taking pertaining to the Tract 1201 lands.
 
 
 37
 On March 17, 1971, the United States noticed its appeals from the district court's judgment of November 25, 1970, and from the order, dated January 21, 1971, denying its motion for new trial.
 
 
 38
 The district judge on March 17, 1971, denied Ocala Manufacturing's March 10 motion to set aside the final judgment and the declaration of taking as to Tract 1201. A few days later, on March 26, 1971, Ocala Manufacturing gave notice of its appeals from the judgment entered November 25, 1970, and from the March 17, 1971, order denying the motion to set aside the judgment and the declaration of taking as to the Eureka Pool lands.
 
 
 39
 On July 13, 1971, the district judge denied Ocala Manufacturing's motion, filed January 29, 1971, to set aside the apportionment judgment rendered January 21, 1971. Ocala Manufacturing, on July 28, 1971, gave notice of its appeal from the July 13, 1971 order refusing to set aside the apportionment judgment. The final appeal in this matter was lodged on August 9, 1971, when the Canal Authority gave notice of its cross-appeal from the apportionment judgment of January 21, 1971.
 
 THE APPELLATE OBJECTIVES OF THE PARTIES
 
 40
 The United States, in this Court, does not contest the size of the jury verdict rendered in the federal condemnation proceeding on November 13, 1970. It notes in its brief that:
 
 
 41
 ". . . this appeal is being prosecuted as a precautionary measure to insure that this Court has before it all of the relevant factors, including evidence and rulings of law, which have been made in this complex matter by the state court and the district court in both the valuation and distribution proceedings. We believe this is necessary to prevent a possible inequitable result to both the federal and the Canal Authority's interest should the proceedings be separately treated on appeal." Brief for the United States, pp. 7-8.
 
 
 42
 From this it appears that the United States assumes a posture roughly analogous to that of a stakeholder in an interpleader action, with the qualification that the United States is separately supporting the position of the Canal Authority.
 
 
 43
 As noted earlier in this opinion, the Canal Authority is obligated to reimburse the United States for the cost of the real property acquired in this federal condemnation proceeding. Its primary objective, therefore, is to minimize the amount which Ocala Manufacturing might be awarded by the federal courts. The Canal Authority advances as theoretical justification for such a minimization the argument that the state condemnation judgment implicitly vested in the Canal Authority a flowage easement across the Tract 1201 lands equivalent in value to the difference between the state jury verdict ($573,292.00) and the Ocala Manufacturing's high testimony of the fee value of the lands taken in the state proceeding ($163,691.00).
 
 
 44
 Finally, Ocala Manufacturing seeks to maximize the just compensation due it for the taking of the Tract 1201 lands. It contends that the state condemnation judgment endowed the Canal Authority with no rights whatsoever in the Tract 1201 lands and that assuming the state jury considered the damage to Parcel #1 caused by the taking of Parcels #2, #3, #4 and #5, it is impossible, at this late date, to determine just what portion of the state jury's verdict is to be allocated to the anticipated damages to Parcel #1. In the alternative, Ocala Manufacturing asks this Court to set aside the final judgment and the declaration of taking pertaining to the Tract 1201 lands and restore it to ownership. In this connection it offers to refund all moneys it has received in payment for Tract 1201.
 
 THE APPELLATE CONTENTIONS OF THE PARTIES
 
 45
 The United States first argues that the district court erred in excluding any consideration by the jury of the prior state condemnation proceeding. It asserts that the jury in the federal proceeding should have been exposed to evidence tending to show that the state court jury valued the 500 acres of land taken in that proceeding at $575,292.00, or $409,601.00 more than the landowner's highest evidence of the value of the lands actually taken. Second, the United States asserts that the district court's non-jury apportionment proceeding only partially mitigated the failure to submit to the federal jury evidence of the state jury's valuation.
 
 
 46
 The Canal Authority supports the district court's determination that the state condemnation proceeding vested in the Canal Authority some interest in the Tract 1201 lands. It contends, however, that the district judge's determination that Ocala Manufacturing was entitled to receive $850,000.00 out of the federal jury's verdict is without support in the record and resulted in the payment of dual compensation to Ocala Manufacturing for the right to flood the Tract 1201 lands. Finally, the Canal Authority asserts that the district court committed error in refusing to strike the testimony of one of Ocala Manufacturing's witnesses, Appraiser J. Alvin Register, who testified at the apportionment hearing that the value of the right to flood Tract 1201 was $21,000.00.
 
 
 47
 Ocala Manufacturing, as related earlier, pursues alternative objectives in this Court: (1) the maximization of its federal condemnation award; and (2) the return of the lands described as Tract 1201. Its appellate contentions will be outlined accordingly.
 
 
 48
 With respect to its first objective of maximum just compensation Ocala Manufacturing argues:
 
 
 49
 1. The district court did not err in excluding from the federal jury's consideration the value fixed by the state jury for the acreage which the Canal Authority was permitted by the state court to condemn;
 
 
 50
 2. The district court did not err in ruling that the basic issue to be determined by the federal jury was the just compensation for the estate as set forth in the condemnation complaint as of the date of taking;
 
 
 51
 3. The district court erred in ruling that the Canal Authority had a compensable interest in the lands designated as Tract 1201;
 
 
 52
 4. There was no basis in the evidence for the award to the Canal Authority of $243,316.50 for its interest in Tract 1201; the maximum award the Canal Authority could possibly be entitled to is $21,000.00, Mr. Register's appraisal of the value of the Canal Authority's right to flood Tract 1201 to a level at 41 feet above mean sea level (natural flooding having already raised the water level to 41.2 feet).
 
 
 53
 Ocala Manufacturing, as to its second objective (return of Tract 1201), maintains:
 
 
 54
 1. The district court erred in summarily striking its affirmative defenses that: (a) the Canal Authority was the real party in interest in the federal condemnation proceeding; and (b) the doctrines of res judicata and/or collateral estoppel barred the relitigation of the issue of the Canal Authority's right to condemn the fee simple title to Tract 1201's lands.
 
 
 55
 2. The district court erred in entering an order granting possession of Tract 1201 to the United States without a hearing.
 
 
 56
 3. The district court erred in denying Ocala Manufacturing's motion to set aside the declaration of taking and the final judgment.
 
 THE EXISTENCE OF A COMPENSABLE INTEREST
 
 57
 During the course of the state condemnation jury trial, evidence was presented bearing upon the question of damages to remaining lands not taken by the Canal Authority. This evidence sought to focus the jury's attention upon the following elements of severance damages: (1) loss of access; (2) damage to remaining timber; (3) loss of water-front; (4) impairment of access; and (5) potential flooding. It appears that each of these elements is a legitimate basis for the award of severance damages under Florida condemnation law.[16] See, e. g., Worth v. City of West Palm Beach, 1931, 101 Fla. 868, 132 So. 689 (loss of access to lake frontage caused by the taking of land for construction of a street held compensable); State Road Department of Florida v. Zetrouer, 105 Fla. 650, 142 So. 217 (jury held authorized to award damages in a condemnation proceeding for the depreciation in value of the defendant's land resulting from the relocation of a right of way); and State Road Department of Florida v. McCaffrey, Fla.App.2, 1969, 229 So.2d 668 (adjoining property owners held entitled to compensation for loss of access to a state road caused by the State Road Department's conversion of the road to a limited access facility).
 
 
 58
 If the state condemnation trial had taken place after October 1, 1970, it would be a relatively easy task to determine if the Canal Authority was vested with the right to flood Tract 1201 by virtue of the state court's judgment and the amount awarded therefor. As noted in footnote 10, supra, Fla.Stat. Sec. 73.081 now requires Florida condemnation juries to state severance damages separately from the amounts of other damages awarded. Prior to the effective date of the revision of Sec. 73.081, the jury was under a duty merely to state the amount of compensation to which each owner was entitled, precisely what the jury did in the state case, Action #69-203.
 
 
 59
 The Canal Authority argues that the district court acted correctly in holding that the state condemnation judgment vested the Canal Authority with some interest in the Tract 1201 lands, that interest being the right to flood 2,100 acres of Tract 1201. Ocala Manufacturing, on the other hand, contends that there is no way to determine just what factors went into the jury's verdict in the state action because five (5) elements of severance damages were presented to the jury for its consideration, and because the compensation awarded fixed a whole sum.
 
 
 60
 We agree with Ocala Manufacturing's position on this point. Phrased simply, there is not enough reliable information available from which to ascertain just what elements of severance damages were included in the state jury's verdict. This informational insufficiency is so fundamental to this case that nothing would have been gained had the district court permitted the federal jury to take into consideration the state condemnation judgment. We conclude, therefore, that the district court was without a rational basis for finding that the Canal Authority was vested with a right to flood 2,100 acres of Tract 1201 by virtue of the state judgment.
 
 
 61
 Having determined that the district court erred in holding that the Canal Authority, as a result of the state proceeding, possessed a compensable interest in Tract 1201, we must address ourselves to the manner in which the federal condemnation judgment should be apportioned. As noted at the beginning of this opinion, this unfortunate situation would not have arisen had the Canal Authority pursued its appellate remedies following the state court's refusal to approve the taking of fee simple title to Parcel #1. The Canal Authority, probably to avoid the delays expected in the Florida appellate courts, or for some other reason, opted instead to enlist the assistance of the United States Army Corps of Engineers in securing fee simple title to the Eureka Pool property, Parcel #1. The Corps of Engineers cooperated fully by taking the necessary steps to initiate and complete the federal condemnation proceeding now before us on this appeal. It is clear that the federal suit succeeded where the state action-at least on the trial level -failed. In the federal suit the Cross-Florida Barge Canal project obtained complete ownership rights to the fee title to Tract 1201 with a minimum of delay. We recognize the possibility also present that Ocala Manufacturing may receive a windfall in the form of double payment for the right to flood the Eureka Pool area should we award it the full amount of the federal condemnation judgment.
 
 
 62
 The Canal Authority's arguments that it dismissed Parcel #1 from its state condemnation action (with subsequent resort to the power of the United States to obtain fee simple title) to minimize delays in the completion of the canal undertaking and that the award of the entire federal condemnation judgment to the landowner would constitute an undeserved windfall are on their face persuasive. Nevertheless, we are unable to reach a better solution than that Ocala Manufacturing be given judgment for the full amount of the federal judgment. Without question, Ocala Manufacturing is equitably entitled at least to a very considerable portion of the federal award. It is not the fault of the land-owner Ocala Manufacturing, that the impenetrable veil of the state judgment renders a rational apportionment out of the question. If fault is present, it is that of the Canal Authority. If the Canal Authority had either (1) pursued its appellate remedy from the state court refusal to allow the taking of a fee simple title to Tract #1, or (2) had initially asked the United States to bring federal condemnation proceedings against all the Ocala Manufacturing owned lands required for the Canal, the present dilemma would not exist. The possibility that Ocala Manufacturing may receive double compensation for a portion of its interest in Tract 1201 is the price the Canal Authority must bear for dragging the federal judiciary into this jurisprudential quagmire. No completely satisfactory result can be achieved. We adopt the least objectionable.
 
 
 63
 THE RIGHT OF OCALA MANUFACTURING TO REGAIN POSSESSION OF TRACT 1201
 
 
 64
 As noted earlier, Ocala Manufacturing alternatively seeks a return of its Eureka Pool property. It advances two theories in this regard: (1) the Canal Authority was the real party in interest plaintiff in the federal condemnation action and was barred from relitigating its power to condemn the fee simple title to the Eureka Pool lands when it failed to appeal the state court ruling that a fee title was unnecessary and (2) the federal declaration of taking and the condemnation judgment should have been set aside by the district court following the President's decision to halt further work on the Cross-Florida Barge Canal.
 
 
 65
 With respect to Ocala Manufacturing's first theory we hold that the United States, acting pursuant to explicit statutory authorization, see footnotes 11-15, supra, was the real party plaintiff in interest in the federal condemnation action. The Cross-Florida Barge Canal project was designated by Congress for federal participation. In addition, Congress, by means of Title 33, United States Code, Sections 592 and 593, clearly envisioned the eventuality that the federal power of eminent domain would be required in aid of an undertaking such as the Cross-Florida Barge Canal. The first theory advanced by Ocala Manufacturing is without merit.
 
 
 66
 Ocala Manufacturing's second theory is articulated in its brief to this Court as follows:
 
 
 67
 "The District Court, while having jurisdiction of the cause, erred in denying the motion to set aside the declaration of taking and the final judgment upon abandonment of the public use for which the lands are sought. In the case at bar, while the District Court still had jurisdiction of the cause, the President of the United States, Richard M. Nixon, by Presidential Order, halted the construction of the Cross Florida Barge Canal and ordered an abandonment of the project and the United States Army Corps of Engineers pursuant to that Order is now doing restorative work on those portions of the project which have been partially completed by removing embankments and so forth. All logic and reason supports the proposition that in the event that the public use for which lands are being taken has ceased prior to the conclusion of the proceedings for the taking of the lands those proceedings should be abated. Were an eminent domain proceeding instituted today for the acquisition of these lands known as Tract 1201, it would be a valid defense that the lands were not needed for public purpose or for a public use because of a published Order of the President of the United States. The fact that the proceeding has been started prior to the published Order should make no difference. This is not a case where the District Court had lost jurisdiction prior to the abandonment of the project but on the contrary, the project was abandoned while the District Court had jurisdiction. It is elementary that a District Court, while having jurisdiction of a cause, can alter any orders theretofore entered upon a subsequent change in facts and circumstances as we have in this case. The Constitution of the United States and the eminent domain statutes of the United States do not allow the taking of private property for any use other than a public use. In the case at bar the necessity for public use of the lands designated as Tract 1201 has ceased. Thus it appears that the District Court erred in refusing to grant the motion of the landowner to set aside the final judgment and declaration of taking in the instant case." Brief for Appellee-Cross Appellant, pages 26-27.
 
 
 68
 Title 40, United States Code, Section 258a (the text of which appears in footnote 15, supra) specifically provides that:
 
 
 69
 "Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States . . ."
 
 
 70
 In light of Section 258a, it is clear that the district court was without power, following the presidential order of January 19, 1971, to strip the United States of its fee simple title to Tract 1201. The critical date was the date of taking, October 3, 1969. It would appear that the provisions of Title 40, United States Code, 304a[17] govern the disposition of real property no longer required for public use.
 
 
 71
 In our resolution of these appeals we intend no expression of opinion of the validity of the presidential order of January 19, 1971 which halted further construction work on the Cross-Florida Barge Canal. With several other questions, the issue of validity of the presidential order is now pending before the United States District Court for the Middle District of Florida. See, In re Cross-Florida Barge Canal Litigation, supra.
 
 CONCLUSION
 
 72
 For the reasons set forth above, the judgment of the district court is reversed and the cause is remanded to the district court with directions to enter judgment in favor of Ocala Manufacturing in the amount of $1,093,316.50 plus interest as provided by law.
 
 
 73
 Reversed, with directions.
 
 
 
 [1]
 "374.011 Canal authority, creation; short title
 There is hereby created a body corporate, with the name 'The canal authority of the State of Florida,' (herein called the corporation), which shall operate under the supervision of the department of natural resources. The principal office and necessary branch offices of the corporation shall be established at such places and under such rules and regulations as the board of directors may prescribe. This act may be cited as the 'canal authority act'."
 
 
 [2]
 "374.051 Special powers
 (1) The corporation is hereby granted the right, privilege, franchise, power and authority:
 (a) To acquire, own, construct, operate and maintain a canal across the peninsula of Florida, connecting the waters of the Atlantic ocean with the waters of the Gulf of Mexico, together with sea and river approaches thereto, and such lateral and connecting branches as may be necessary or desirable; including a branch to link the St. Johns river with the Atlantic intracoastal waterway, and a branch to link the western reaches of such canal with the eastern terminus of the inland portion of the Gulf intracoastal waterway and the northern terminus of the inland portion of the Gulf intracoastal waterway, such canal shall be constructed along such route, and to be of such size, dimensions, specifications, kind or type as may be approved by the department of the army or other appropriate department or agency of the United States. . . ."
 
 
 [3]
 "374.071 Eminent domain
 The said corporation is hereby authorized and empowered to acquire by condemnation, rights of way of such lengths and widths as may be reasonably necessary for the proper construction and efficient operation, repair and improvement of said canal and canal system, its embankments, locks and appurtenances, for spoil areas and borrow pits and for approaches to bridges and tunnels, crossing over or under said canal, including the right to condemn such rights of way (of the lengths and widths as above set forth) over property already devoted to public use for railroad, canal or other public utility purposes, wherever the route of such canal may cross the same and said corporation shall also have the right to acquire by gift, purchase or condemnation, land, timber, earth, rock and other materials or property, and property rights, including riparian rights, in such amounts as may be reasonably necessary or useful in the construction, operation, repair or improvement of said canal and canal system, its improvements, locks and appurtenances. Condemnation proceedings shall be maintained by and in the name of the corporation and the procedure shall be, except insofar as is altered hereby, that now prescribed for condemnation proceedings by railroad corporations in this state."
 
 
 [4]
 "374.171 Transfer to federal government
 In the event that the United States should decide to undertake the construction of said canal across Florida, by an agency or department of the federal goverment, or in the event the United States should at any time desire to take over the ownership or possession of said canal for the purpose of operating the same free of tolls, the board of directors of the corporation is authorized, upon such terms and in such manner as said board shall deem proper, to assign, transfer and convey to the United States, or to the appropriate agency thereof, such assets, franchises and property, or interests therein, of the corporation, including lands, easements, and rights of way acquired by said corporation hereunder, as may be necessary or desirable, in said board's judgment, to accomplish such purposes."
 
 
 [5]
 The Chief of Engineers' letter, later catalogued as House Document No. 109, 79th Congress, 1st Session, read as follows:
 "WAR DEPARTMENT, OFFICE OF THE CHIEF OF ENGINEERS,
 Washington, June 15, 1942.
 Hon. Joseph J. Mansfield,
 Chairman, Committee on Rivers and Harbors,
 House of Representatives, Washington, D.C.
 Dear Judge Mansfield: Reference is made to your letter of June 11, 1942, stating that H.R. 6999 will be taken up in the House for consideration on June 17 and that in connection therewith information is desired pertaining to certain engineering features and costs of a barge canal across northern Florida and as to its effect on the fresh water supply of that State. You also request a statement as to whether the proposed intracoastal waterway channel connecting such a barge canal with the existing eastern terminus of the Gulf Intracoastal Waterway might be eliminated.
 The Board of Engineers for Rivers and Harbors, in connection with its studies of a waterway across northern Florida, finds that the most feasible method of providing for the accommodation of barge traffic between the Atlantic and Gulf coasts would be by means of a lock canal. Such a canal with depth of 12 feet and width of 150 feet along route 13-B, which follows the St. Johns River to Palatka, thence the valley of the Oklawaha River across the divide, and the valley of the With-lacoochee River to the Gulf, is estimated to cost $44,000,000.
 A lock canal for barge traffic following route 13-B would in no way affect the ground-water supply in the area. By providing three locks on the east slope and two on the west slope with total lifts of 55 feet, the water surface of the summit pool could be maintained between elevations 42 and 55 which is the range through which the water table in the adjacent area has fluctuated in the past. A barge canal of such design with necessary lockage water supplied from the combined natural discharge of the Oklahoma River and Silver Spring Run would result in no damage to lands as the groundwater conditions along the route of the waterway would be unchanged.
 With reference to the use by intracoastal waterway traffic of the open Gulf between the eastern terminus of the present intracoastal waterway in the vicinity of Apalachee Bay and the Gulf terminus of the above-mentioned barge canal, it may be stated that coastwise traffic now follows this route and that while some danger is connected therewith, I am informed that there is very little time lost in navigating this portion of the Gulf. Accordingly, it would be possible to eliminate that section of the intracoastal waterway from the improvements proposed in H.R. 6999 and still move very large quantities of commerce by barge from terminals along the Gulf coast to the eastern seaboard with the completion of the other improvements proposed in the bill.
 Since time has not permitted me to ascertain whether the information presented in this letter is in accord with the program of the President, such information should be considered as factual and involving no commitment as to that program.
 Very truly yours,
 E. REYBOLD,
 Major General,
 Chief of Engineers."
 
 
 [6]
 Public Law 77-675 provided:
 "AN ACT
 To promote the national defense and to promptly facilitate and protect the transport of materials and supplies needful to the Military Establishment, by authorizing the construction and operation of a pipe line and a navigable barge channel across Florida, and by deepening and enlarging the Intracoastal Waterway from its present eastern terminus to the vicinity of the Mexican border.
 Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, in order to promote the national defense and to promptly facilitate and protect the transport of materials and supplies needful to the Military Establishment, there is hereby authorized to be constructed under the direction of the Secretary of War and the supervision of the Chief of Engineers a high-level lock barge canal from the Saint Johns River across Florida to the Gulf of Mexico in accordance with the plans set forth in the letter of the Chief of Engineers dated June 15, 1942; and that there is also authorized the enlargement of the present Intracoastal Waterway from the vicinity of Apalachee Bay to Corpus Christi, Texas, and its extension to the vicinity of the Mexican border so as to provide throughout the entire length of the canal a channel twelve feet deep and one hundred and twenty-five feet wide: Provided, That between Mobile, Alabama, and New Orleans, Louisiana, the project shall be modified in accordance with the recommendations of the Chief of Engineers in his report dated April 27, 1942, except that the annual payments to be made by the Government to the Board of Commissioners of the Port of New Orleans are not limited by this Act to the amount recommended by the Chief of Engineers but are left open to negotiations between the Board of Commissioners of the Port of New Orleans and the Chief of Engineers: Provided further, That the Chief of Engineers is authorized to expedite the utilization of the facilities herein above authorized by the employment of temporary structures and available materials, and within reasonable limits to vary, in his discretion, the above-prescribed dimensions wherever advisable: And provided further, That subject to the provisions of Public Law 197, Seventy-seventh Congress, there is authorized to be constructed one or more pipe lines, together with all necessary terminal facilities, for the transport of petroleum and its products, from the vicinity of Port Saint Joe and other points on the Gulf Coast of Florida to the Saint Johns River, and a crude-oil pipe line from the Tinsley Oil Field in the vicinity of Yazoo, Mississippi, to Charleston, South Carolina, and/or Savannah, Georgia.
 Sec. 2. There is hereby authorized to be appropriated the sum of $93,000,000 to carry out the provisions of this Act."
 
 
 [7]
 "Sec. 104. (a) That the Secretary of the Army is authorized and directed to donate and convey by quitclaim deed to the Ship Canal Authority of the State of Florida all of the right, title, and interest of the United States of America in and to-
 (1) lands in Putnam County, Florida, acquired by the United States of America by condemnation proceedings in the United States District Court for the Southern District of Florida, Jacksonville Division, as case numbered 356 U.S.J. Civil; and (2) lands in Marion County, Florida, acquired by the United States of America by condemnation proceedings instituted in the United States District Court for the Southern District of Florida, Ocala Division, as cases numbered 9, 10, 11, 12, 13, 14, 15, 16, and 22, U.S. Ocala Civil.
 (b) It is intended hereby to authorize and direct the conveyance of all lands heretofore acquired by the United States with funds provided by the said authority for rights-of-way for a proposed ship canal across Florida.
 (c) The conveyance authorized by this section shall be made without monetary consideration therefor but upon the conditions that the Ship Canal Authority of the State of Florida will, without cost to the United States: (1) when called upon by the Chief of Engineers, United States Army, to do so, reconvey to the United States, free of any encumbrances placed thereon during ownership by said authority, those lands conveyed pursuant to this section that are required for the Cross Florida Barge Canal; (2) relocate any roads, bridges, or utility lines constructed on or across such lands after the conveyance under this section by the United States, if the relocation thereof is required by the Chief of Engineers; (3) maintain and preserve improvements previously constructed upon the land by the Federal Government in a manner that will not increase the cost of the barge canal project; (4) hold the United States safe and free from any damages resulting from the aforementioned construction; and (5) devote the proceeds from sales of any lands conveyed to it under this section solely for the acquisition, for transfer to the United States free of cost, of any other lands required for the barge canal project.
 (d) Nothing in this section shall be construed as a limitation on the right of the Ship Canal Authority of the State of Florida to sell any of the lands that, in the opinion of the United States Army district engineer at Jacksonville, Florida, will not be required for the Cross Florida Barge Canal. Any surveys or descriptions required to permit the disposal of any such lands shall be paid for by the Ship Canal Authority of the State of Florida if desired by said authority prior to the appropriation of funds therefor by the Federal Government.
 (e) Nothing in this section shall be construed as a waiver of the obligation of the Ship Canal Authority of the State of Florida to (1) furnish, without cost to the United States, all lands, easements, and rights-of-way necessary for the contruction of the Cross Florida Barge Canal as authorized by the Act of July 23, 1942 (56 Stat. 703); (2) hold and save the United States free from any damages resulting from the construction of said barge canal; and (3) to take over, maintain and operate all highways, bridges, and roadways built in connection with the said barge canal project."
 
 
 [8]
 "THE WHITE HOUSE STATEMENT BY THE PRESIDENT
 I am today ordering a halt to further construction of the Cross Florida Barge Canal to prevent potentially serious environmental damages.
 The purpose of the Canal was to reduce transportation costs for barge shipping. It was conceived and designed at a time when the focus of Federal concern in such matters was still almost completely on maximizing economic return. In calculating that return, the destruction of natural, ecological values was not counted as a cost, nor was a credit allowed for actions preserving the environment.
 A natural treasure is involved in the case of the Barge Canal-the Oklawaha River -a uniquely beautiful, semitropical stream, one of a very few of its kind in the United States, which would be destroyed by construction of the Canal.
 The Council on Environmental Quality has recommended to me that the project be halted, and I have accepted its advice. The Council has pointed out to me that the project could endanger the unique wildlife of the area and destroy this region of unusual and unique natural beauty.
 The total cost of the project if it were completed would be about $180 million. About $50 million has already been committed to construction. I am asking the Secretary of the Army to work with the Council on Environmental Quality in developing recommendations for the future of the area.
 The step I have taken today will prevent a past mistake from causing permanent damage. But more important, we must assure that in the future we take not only full but also timely account of the environmental impact of such projects -so that instead of merely halting the damage, we prevent it."
 
 
 [9]
 At the time of the filing and trial of this suit Florida Statutes 73.071, F.S.A. provided:
 
 
 [73]
 071 Jury trial; compensation; severance damages.-
 (1) When the action is at issue, the court shall empanel a jury of twelve persons at once and submit the issue of compensation to them for determination which issue shall be tried in the same manner as other issues of fact are tried in the circuit courts.
 (2) The amount of such compensation shall be determined as of the date of trial, or the date upon which title passes, whichever shall occur first.
 (3) The jury shall determine solely the amount of compensation to be paid, which compensation shall include:
 (a) The value of the property sought to be appropriated; and
 (b) Where less than the entire property is sought to be appropriated, any damages to the remainder caused by the taking, including when the action is by the division of road operations of the department of transportation, county, municipality, board, district or other public body for the condemnation of a right-of-way, and the effect of the taking of the property involved may damage or destroy an established business of more than five years' standing, owned by the party whose lands are being so taken, located upon adjoining lands owned or held by such party, the probable damages to such business which the denial of the use of the property so taken may reasonably cause; any person claiming the right to recover such special damages shall set forth in his written defenses the nature and exent of such damages.
 (4) When the action is by the division of road operations, county, municipality, board, district or other public body for the condemnation of a road, canal, levee or water control facility right-of-way, the enhancement, if any, in value of the remaining adjoining property of the defendant property owner by reason of the construction or improvement made or contemplated by the petitioner, shall be offset against the damage, if any, resulting to such remaining adjoining property of the defendant property owner by reason of the construction or improvement, but such enhancement in the value shall not be offset against the value of the property appropriated, and if such enhancement in value shall exceed the damage, if any, to the remaining adjoining property there shall be no recovery over against such property owner for such excess.
 (5) The jury shall view the subject property upon demand by any party or by order of the court.
 (6) If the jury cannot agree on a verdict the court shall discharge them, empanel a new jury, and proceed with the trial.
 (Emphasis supplied)
 
 
 [10]
 As of the date of filing of the state court suit and at the time of its trial, Florida Statutes Sec. 73.081, F.S.A., governing the form of jury verdicts in condemnation, provided:
 "Form of verdict.-The verdict of the jury shall state an accurate description of each parcel of the property sought to be appropriated; and the amount to be paid therefor, together with any damage to the remainder caused by the taking, including business damages where allowable by statute. The compensation awarded by the jury for each parcel of property sought to be appropriated shall be determined as a whole, irrespective of the separate interests of the various parties, or the various items of damages claimed as to each parcel."
 (Emphasis supplied)
 Section 73.081 as to the form of jury verdicts was changed by the 1969 Florida Legislature, to read as follows:
 "Form of verdict.-The verdict of the jury shall state an accurate description of each parcel of the property sought to be appropriated and the amount to be paid therefor, together with any damage to the remainder caused by the taking, and including business damages when allowable by statute. When severance damages, business damages, moving costs, or other special damages are sought, the verdict shall state the amount of such damages separately from the amounts of other damages awarded."
 It is important to our decision to emphasize that at the time of trial all damages, direct or severance, were to be stated as a whole.
 
 
 [11]
 Title 33, United States Code, Section 592:
 "Condemnation of land in aid of person, company, corporation, municipal or private
 Whenever any person, company, or corporation, municipal or private, shall undertake to secure any land or easement therein needed in connection with a work of river and harbor improvement duly authorized by Congress, for the purpose of conveying the same to the United States free of cost, or for the purpose of constructing, maintaining, and operating locks, dry docks, or other works to be conveyed to the United States free of cost, and of constructing, maintaining and operating dams for use in connection therewith, and shall be unable for any reason to obtain the same by purchase and acquire a valid title thereto, the Secretary of the Army may, in his discretion cause proceedings to be instituted in the name of the United States for the acquirement by condemnation of said land or easement, and it shall be the duty of the Attorney General of the United States to institute and conduct such proceedings upon the request of the Secretary of the Army; Provided, That all expenses of said proceedings and any award that may be made thereunder shall be paid by the said person, company, or corporation, to secure which payment the Secretary of the Army may require the said person, company, or corporation to execute a proper bond in such amount as he may deem necessary before said proceedings are commenced."
 
 
 [12]
 Title 33, United States Code, Section 593:
 "Condemnation of land in aid of State or State agency
 Whenever any State, or any reclamation, flood control or drainage district, or other public agency created by any State, shall undertake to secure any land or easement therein, needed in connection with a work of river and harbor improvement duly authorized by Congress, for the purpose of conveying the same to the United States free of cost, and shall be unable for any reason to obtain the same by purchase and acquire a valid title thereto, the Secretary of the Army may, in his discretion, cause proceedings to be instituted in the name of the United States for the acquirement by condemnation of said land or easement, and it shall be the duty of the Attorney General of the United States to institute and conduct such proceedings upon the request of the Secretary of the Army: Provided, That all expenses of said proceedings and any award that may be made thereunder shall be paid by such State, or reclamation, flood control or drainage district, or other public agency as aforesaid, to secure which payment the Secretary of the Army may require such State, or reclamation, flood control or drainage district, or other public agency as aforesaid, to execute a proper bond in such amount as he may deem necessary before said proceedings are commenced."
 
 
 [13]
 Title 33, United States Code, Section 701:
 "Flood control generally
 Laws applicable to works of improvement relating to flood control. All the provisions of existing law relating to examinations and surveys and to works of improvement of rivers and harbors shall apply, so far as applicable to examinations and surveys and to works of improvement relating to flood control. And all expenditures of funds appropriated for works and projects relating to flood control shall be made in accordance with and subject to the law governing the disbursement and expenditure of funds appropriated for the improvement of rivers and harbors.
 Examinations and surveys; details from Government departments; reports. All examinations and surveys of projects relating to flood control shall include a comprehensive study of the watershed or watersheds, and the report thereon in addition to any other matter upon which a report is required shall give such data as it may be practicable to secure in regard to (a) the extent and character of the area to be affected by the proposed improvement; (b) the probable effect upon any navigable water or waterway; (c) the possible economical development and utilization of water power; and (d) such other uses as may be properly related to or coordinated with the project. And the heads of the several departments of the Government may, in their discretion, and shall upon the request of the Secretary of the Army, detail representatives from their respective departments to assist the Engineers of the Army in the study and examination of such watersheds, to the end that duplication of the work may be avoided and the various services of the Government economically coordinated therein: Provided, That all reports on preliminary examinations hereafter authorized, together with the report of the Board of Engineers for Rivers and Harbors thereon and the separate report of the representative of any other department, shall be submitted to the Secretary of the Army by the Chief of Engineers, with his recommendations, and shall be transmitted by the Secretary of the Army to the House of Representatives, and are ordered to be printed when so made.
 Reports by Board of Engineers for Rivers and Harbors. In the consideration of all works and projects relating to flood control which may be submitted to the Board of Engineers for Rivers and Harbors for consideration and recommendation, said board shall, in addition to any other matters upon which it may be required to report, state its opinion as to (a) what Federal interest, if any, is involved in the proposed improvement; (b) what share of the expense, if any, should be borne by the United States; and (c) the advisability of adopting the project.
 Aiding Committee on Public Works. All examinations and reports which may now be made by the Board of Engineers for Rivers and Harbors upon request of the Committee on Public Works relating to works or projects of navigation shall in like manner be made upon request of the Committee on Public Works on all works and projects relating to flood control."
 
 
 [14]
 Title 33, United States Code, Section 701c-2:
 "Acquisition and sale of land
 The provisions of sections 593 to 595 of this title relating to river and harbor improvements are made applicable to works of flood control heretofore or hereafter authorized."
 
 
 [15]
 Title 40, United States Code, Section 258a:
 "Same; lands, easements, or rights-of-way for public use; taking of possession and title in advance of final judgment, authority; procedure
 In any proceeding in any court of the United States outside of the District of Columbia which has been or may be instituted by and in the name of and under the authority of the United States for the acquisition of any land or easement or right of way in land for the public use, the petitioner may file in the cause, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that said lands are thereby taken for the use of the United States. Said declaration of taking shall contain or have annexed thereto-
 (1) A statement of the authority under which and the public use for which said lands are taken.
 (2) A description of the lands taken sufficient for the identification thereof.
 (3) A statement of the estate or interest in said lands taken for said public use.
 (4) A plan showing the lands taken.
 (5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the land taken.
 Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall be charged with commissions or poundage.
 Upon the application of the parties in interest, the court may order that the money deposited in the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding. If the compensation finally awarded in respect of said lands, or any parcel thereof, shall exceed the amount of the money so received by any person entitled, the court shall enter judgment against the United States for the amount of the deficiency.
 Upon the filing of a declaration of taking, the court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner. The court shall have power to make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable."
 
 
 [16]
 "Probably the most prolific source of litigation in the condemnation area stems from the compensation to be granted to the condemnee for damage to his remaining adjoining property
 "In addition to full compensation for the property taken, the property owner may also recover for damages to his remaining adjoining lands; these are commonly called 'severance damages'. The full measure of damages, then, includes both the value of the property taken and the damage to the adjacent remaining property. The primary consideration in computing the value of property taken and the damages to the remainder is the depreciation in value of the entire tract by reason of the taking.
 "Although fair market value is a usual criterion and an important element in the compensation formula, it is not an exclusive standard for determining full or just compensation; and it is not a complete formula when a determination of damage to the remainder of the property is sought. In assessing the damage to remainder property, the court may consider as the compensation the difference in its market value beefore and after the taking.
 "The two theories most used in computing compensation for property taken and damage to the remainder are the market value theory and the before and after theory. Under the market value theory, the compensation is computed by determining the value of the land taken and adding to this amount the difference between the value of the remainder area before and after the taking. Under the before and after theory, the tract is considered as a whole; that is, compensation is fixed by determining the difference between the value of the owner's entire tract, including the parcel taken, before the taking by the condemning authority, and the value of his remaining property. It appears that these rules merely state the same principle in a different way, but the application of the two theories frequently can bring materially different results.
 "Numerous other variations of these methods have been used, but all of them are merely tools to be used by the court or by the jury in determining the ever elusive question of what constitutes full or just compensation.
 "Damage to the remaining property may be caused by taking a portion of a building, by taking such a portion of the land that the property is rendered unusable or less valuable for the purposes for which it is adapted, by separating a parcel of land so that there are two remaining parcels, by the use to which the property owner's land is put by the condemning authority, or in any number of other ways. The primary consideration in computing both the compensation for the property taken and the severance damage is the depreciation in value to the owner by reason of the taking."
 Sheppard, Compensation in Florida Condemnation Proceedings, 14 University of Florida Law Review 18, 37-39 (1961).
 
 
 [17]
 Title 40, United States Code, Section 304a:
 "Disposition of surplus real property; assignment to governmental agency; lease; sale
 Notwithstanding any other provisions of law, whenever any real property located outside of the District of Columbia, exclusive of military or naval reservations, heretofore or hereafter acquired by any Federal agency, by judicial process or otherwise in the collection of debts, purchase, donation, condemnation, devise, forfeiture, lease, or in any other manner, is, in whole or in part, declared to be in excess of it needs by the Federal agency having control thereof, or by the President on recommendation of the Administrator of General Services, the Administrator of General Services is authorized (a) to assign or reassign to any Federal agency or agencies space therein: Provided, That if the Federal agency to which space is assigned does not desire to occupy the space so assigned to it, the decision of the Administrator of General Services shall be subject to review by the President; or (b) pending a sale, to lease such real property on such terms and for such period not in excess of five years as he may deem in the public interest; or (c) to sell the same at public sale to the highest responsible bidder upon such terms and after such public advertisement as he may deem in the public interest: Provided, further, That if no bids which are satisfactory as to price and responsibility of bidder are received as a result of such public advertisement, the Administrator of General Services is authorized to sell such property by negotiation, upon such terms as may be deemed to be to the best interest of the Government, but at a price not less than that bid by the highest responsible bidder."